Presented to the Court by the foreman of the Grand Jury in open Court, in the presence of the Grand Jury and FILED in the U.S. DISTRICT COURT at Seattle, Washington.

November 6, 2019

WILLIAM M. McCOOL, Clerk

By _____ Deputy

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAE Y. LEE,<br>RICHARD W. REID,<br>KEVIN W. PULS, and<br>NORTHWEST PHYSICIANS LABORATORIES, LLC,<br><br>Defendants. | NO. **CR19-228** JCC<br><br>**INDICTMENT** |

The Grand Jury charges that:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

**A. Northwest Physicians Laboratories (NWPL)**

1.  Defendant NORTHWEST PHYSICIANS LABORATORIES, LLC (hereinafter "NWPL") was a toxicology laboratory located in Bellevue, Washington. NWPL was owned by both physician-shareholders and by other equity owners who were called Common Members. The NWPL physician-shareholders were located in

INDICTMENT/LEE, ET AL. - 1

1 Washington State and in other states across the country. NWPL was founded in 2012 and continued to gain physician-shareholders in 2013, 2014, and 2015.

2. Defendant JAE Y. LEE was NWPL's Chief Executive Officer and a Common Member. As the CEO and an owner of NWPL, LEE was responsible for, among other things, determining physician-shareholder membership, making physician-shareholder payments, paying the expenses of the business, and obtaining payments from other toxicology laboratories.

3. Defendant RICHARD W. REID was the lead sales officer for NWPL and a Common Member. REID was responsible for, among other things, NWPL marketing, including training and supervising NWPL sales representatives, recruiting physician-shareholders, and maintaining and terminating physician-shareholder relationships.

4. Defendant KEVIN W. PULS was the Executive Director of NWPL, beginning in 2014. In this role, PULS was responsible for, among other things, directing the marketing of NWPL, training sales representatives to market NWPL, determining physician-shareholder membership, making physician-shareholder payments, and maintaining and terminating physician-shareholder relationships.

5. Defendants JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS took all actions alleged in this Indictment within the scope of their agency for the benefit of NWPL, and their actions were intended, at least in part, to benefit NWPL.

6. Most of the NWPL physician-shareholders treated patients for pain management and often prescribed opioids and other pain management medications to their patients. These physicians therefore sometimes required patients who had been prescribed opioids and other pain management medications to submit urine specimens for toxicology testing in order to monitor the levels of pain medication or other narcotics in their bodies. NWPL physician-shareholders generated thousands of these urine specimens for toxicology testing.

7. When pain management patients provided urine specimens for toxicology testing, their physicians usually sent these specimens to an outside laboratory that ran a

particular panel of tests based on the physicians' orders. Testing laboratories typically billed the patients' commercial insurance, or a federal health care program, or the patient himself or herself, for performing urine toxicology testing. Urine toxicology testing was a covered service under Medicare, TRICARE, and Medicaid, and most private commercial insurance, so long as the testing was reasonable and medically necessary.

8. NWPL performed urine toxicology testing. NWPL received almost all of its urine specimens for toxicology testing from its physician-shareholders. The physician-shareholders directed their patients to provide urine specimens, and NWPL collected these urine specimens and transported the specimens to its Bellevue, Washington, laboratory at no cost to the physician-shareholders. NWPL employees tested the urine specimens from patients covered by commercial insurance. NWPL made money by submitting these urine toxicology tests for payment to the patients' commercial insurance.

9. NWPL executives, namely, JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS, offered NWPL physician-shareholders between one and eleven ownership shares. The cost to purchase one ownership share was a one-time payment of $3000.

10. JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS caused NWPL to make monthly dividend payments to its physician-shareholders based on the number of ownership shares held by that physician-shareholder. From 2013-2015, the monthly payment to NWPL physician-shareholders was $4000 per month, per share. LEE, REID, PULS, and others determined the number of ownership shares for each shareholder based, in part, on the number of urine specimens that the physician-shareholder sent to NWPL for toxicology testing. Physician-shareholders who sent more urine specimens for toxicology testing to NWPL received more shares and larger payments than shareholders who sent fewer specimens. By early 2015, the NWPL physician shareholders with the most urine specimens were receiving more than $20,000 a month in payments. If a NWPL physician-shareholder did not send sufficient urine toxicology specimens to

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

NWPL, the shareholder's membership was terminated and the shareholder's shares were redeemed.

11.   Federal law restricted physicians from referring patients for services, paid for by Medicare or other federal health care programs, to an entity that the physician owned, like a physician-owned laboratory. Further, federal law prohibited paying anything of value for referrals payable by a federal health care program. Accordingly, NWPL did not test urine specimens from patients with federal insurance and NWPL did not bill federal insurance.

### B. Sterling Reference Laboratories (Sterling)

12.   Sterling Reference Laboratories (hereinafter "Sterling") was a toxicology testing laboratory located in Tacoma, Washington and performed toxicology testing on urine specimens. Sterling was a competitor with NWPL. Sterling had other laboratory locations in Colorado and New York (collectively referred to hereinafter as "Sterling"). Sterling was not a physician-owned laboratory. Sterling was an approved Medicare provider and Sterling regularly submitted claims to Federal health care programs for payment.

### C. Molecular Testing Labs (MTL)

13.   Molecular Testing Labs (hereinafter "MTL") was a toxicology and genetics testing laboratory located in Vancouver, Washington. Steven P. Verschoor was a co-founder and the Vice President of Global Sales and Marketing for MTL. In the role of Vice President of Sales and Marketing, Verschoor was responsible for, among other things, managing the relationship between MTL and NWPL. MTL performed toxicology testing on urine specimens, and was a competitor of NWPL and Sterling. MTL was not a physician-owned laboratory. MTL was an approved Medicare provider and regularly submitted claims to Federal health care programs for payment.

### D. Federal Health Care Programs

14.   The Medicare program ("Medicare") was a health care program established under Title XVIII of the Social Security Act, to provide health care insurance coverage

for medical services for persons who were 65 years and older or disabled. Medicare is a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), that is, a plan or program that provides health benefits and is funded directly, in whole or in part, by the federal government.

15. The TRICARE program ("TRICARE") was a health care program of the United States Department of Defense (DOD) Military Health System that provided coverage for DOD beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors. TRICARE is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

16. The Medicaid program ("Medicaid") was a health care program established under Title XIX of the Social Security Act. Medicaid provides health coverage to eligible low-income adults, children, pregnant women, elderly adults and people with disabilities. The program is jointly funded by States and the federal government, and is administered by States according to federal requirements. Medicaid is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

## COUNT 1

**(Conspiracy to Solicit and Receive Kickbacks Involving Health Care Programs and to Offer and Pay Kickbacks Involving Health Care Programs)**

17. The allegations in paragraphs 1-16 are re-alleged and incorporated by reference as if set forth in full herein.

A. **The Conspiracy**

18. Beginning in or before November 2012, and continuing until in or about July 2015, at Bellevue, within the Western District of Washington, and elsewhere, Defendants JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and NORTHWEST PHYSICIANS LABORATORIES, LLC, and others, including Steven P. Verschoor (collectively the "Co-Conspirators"), did knowingly and willfully conspire, combine, confederate, and agree among themselves, and with other persons, to commit offenses in violation of the laws of the United States, to wit:

(1) to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, from Sterling, MTL, and others, in return for LEE, REID, PULS, NWPL, and others ordering, and arranging for the ordering of, urine toxicology testing and related services to be conducted by Sterling and MTL for which payment was made in whole and in part under a Federal health care program, that is, Medicare, TRICARE, and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B).

(2) to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, from MTL to NWPL, in order to induce the Co-Conspirators and others to order, and arrange for the ordering of, urine toxicology testing and related services to be conducted by MTL for which payment was made in whole and in part under a Federal health care program, that is, Medicare, TRICARE, and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

## B. The Purpose of the Conspiracy

19. The purpose of the conspiracy was for NWPL executives, including Defendants JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS, to enrich themselves, NWPL, and the NWPL physician-shareholders by obtaining money in the form of kickback payments, in exchange for arranging for urine specimens, the testing of which had been ordered by NWPL physicians, to be transported to Sterling and MTL for testing and the submission of claims to the federal government for these tests. As to Steven P. Verschoor, the purpose of the conspiracy was for MTL to test these urine specimens, to submit claims to the federal government for these tests, and to receive payment for those claims, in order to enrich MTL and its owners, including Verschoor. During the course of the conspiracy, NWPL received over $3.8 million in kickback payments from Sterling and MTL. During the course of the conspiracy, Sterling and MTL received more than $7.5 million in payments from Medicare, TRICARE, and

Medicaid for urine toxicology testing ordered by NWPL physician-shareholders that was arranged to be tested by Sterling and MTL by the Co-Conspirators.

### C. The Manner and Means of the Conspiracy

20. Even though NWPL did not test urine specimens from patients with federal insurance, or submit bills to Federal health care programs, JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS, and others, in order to get kickback payments from Sterling and from MTL, directed the NWPL physician-shareholders to send all urine specimens that needed toxicology testing to NWPL's Bellevue laboratory, including urine specimens from patients with federal insurance.

21. JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS rewarded NWPL physician-shareholders for sending urine specimens from federally-insured patients to NWPL by offering certain physician-shareholders more ownership shares based on the total amount of urine specimens sent to NWPL, including urine specimens from federally-insured patients. Accordingly, NWPL, at the direction of the other Co-Conspirators, paid the physician-shareholders kickbacks in the form of increased monthly dividend payments for sending NWPL federally-insured urine specimens.

22. Once the federally-insured urine specimens arrived at NWPL's Bellevue laboratory, JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and other NWPL employees controlled these urine specimens, rather than the physician-shareholders. In this way, LEE, REID, and PULS, were able to solicit kickbacks from other toxicology laboratories in exchange for arranging for the toxicology testing of these federally-insured patients' urine specimens.

23. JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS solicited Sterling and MTL and sought remuneration in the form of kickback payments to NWPL in return for arranging for urine specimens from federally-insured patients to be tested at Sterling and MTL, and based on the value of those urine specimens to Sterling and MTL.

24. In order to disguise Sterling and MTL's kickback payments, JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS created sham agreements called

"Administrative Services Agreements" that falsely described Sterling and MTL's payments to NWPL as payments for services rendered by NWPL. LEE, REID, and PULS required that representatives from Sterling and MTL make payments to NWPL pursuant to these sham Administrative Services Agreements in order to receive urine specimens under the Co-Conspirators' control. However, as LEE, REID, and PULS knew, NWPL did not perform all or most of the services listed in the Administrative Services Agreements and the Administrative Services Agreements were not arms-length, fair market value contracts.

25. JAE Y. LEE, on behalf of NWPL, signed Administrative Services Agreements with Sterling in January 2013, December 2013, August 2014, and February 2015; LEE signed an Administrative Services Agreement with MTL in September 2014. LEE was the lead NWPL negotiator for each of these agreements and demanded large payments based on the value of the urine specimens to Sterling and MTL. Neither LEE nor other Co-Conspirators sought payment for the actual cost to NWPL to perform services. Rather than a contract for services, the Administrative Services Agreement reflected payment for arranging for urine specimens to be sent to Sterling and MTL for testing.

26. The Administrative Services Agreements were actually disguised kickback payments because, among other reasons, the agreements purported to cause Sterling and MTL to pay NWPL hundreds of thousands of dollars a year for NWPL representatives to market Sterling and MTL's lab testing services to potential customers. The sham Services Agreement falsely listed a series of marketing tasks that NWPL representatives were required to perform on behalf of Sterling and MTL and falsely listed the number of employees to perform these tasks. Even though NWPL agreed to perform marketing services for Sterling and MTL, JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS and others did not hire sufficient sales employees and did not direct NWPL sales employees to market Sterling and MTL as described in the Service Agreements. LEE, REID, and PULS further concealed and misrepresented the financial relationships

between NWPL and Sterling, and NWPL and MTL, from its sales employees and other NWPL employees.

27. The so-called marketing payments from Sterling were, in fact, payments for urine specimens and were not in exchange for actual marketing services. For example, in December 2013, NWPL signed an Administrative Services Agreement with Sterling to perform marketing services throughout 2014, but in August 2014, JAE Y. LEE caused NWPL and Sterling to enter into another agreement that purported to require NWPL to perform additional marketing services for Sterling. However, in truth and in fact, and as LEE, KEVIN W. PULS, and RICHARD W. REID well knew, LEE, PULS, and REID did not intend to perform any additional marketing services for Sterling and the August 2014 Administrative Services Agreement was a sham intended to cause Sterling to pay additional money to NWPL because the volume of NWPL's urine specimens that Sterling received were higher than expected.

28. Even though NWPL had signed Administrative Services Contracts with Sterling in 2013 and 2014, JAE Y. LEE signed another Administrative Services Agreement with a different toxicology laboratory, MTL, in September 2014. Even though LEE had signed agreements with Sterling that purported to pay for half of NWPL's marketing expenses, LEE signed a similar agreement with MTL that also purported to pay for half of NWPL's marketing expenses. The Co-Conspirators were aware that these so-called services payments from Sterling and MTL were in excess of NWPL's marketing expenses, but continued to collect the kickback payments.

29. Rather than a contract for services, the MTL Administrative Services Agreement reflected payment for arranging for urine specimens to be sent to MTL for testing. The MTL Administrative Services Agreement required MTL to pay NWPL $99,959 per month for a period of 12 months. However, prior to signing the agreement, JAE Y. LEE and other Co-Conspirators wrongfully agreed that MTL would pay NWPL approximately $50,000 per month for arranging for 500 urine specimens to be tested at MTL, and that MTL would pay NWPL approximately $100,000 per month for arranging

1  for 1000 urine specimens to be tested at MTL. The Co-Conspirators based the amounts of the actual payments made under the Administrative Services Agreement on the number of urine specimens that were ultimately sent from NWPL to MTL. MTL actually made $50,000 payments to NWPL every month from October 2014 through June 2015 because the Co-Conspirators had agreed that MTL would pay only $50,000 per month, not $99,959 per month as required by the Administrative Services Agreement, because NWPL was not sending the expected number of urine specimens to MTL.

30. The payments under the Administrative Services Agreements were disguised kickback payments and not legitimate payments for services rendered, because the agreements purported to cause Sterling and MTL to pay for other services that either were not provided or that provided no benefit to Sterling or MTL. For example, the sham Administrative Service Agreements required Sterling and MTL to pay for the transportation of urine specimens from NWPL physician-shareholder offices to NWPL's Bellevue laboratory, for laboratory staff, and other payments that were in excess of NWPL's actual expenses.

31. The payments under the Administrative Services Agreements were disguised payments for urine specimens and not legitimate payments for services rendered, because when Sterling or MTL were late in making payments to NWPL, or missed an expected payment to NWPL, JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and others at NWPL, refused to arrange for urine specimens to be sent to Sterling or MTL, and threatened to stop arranging for urine specimens to be sent to Sterling and MTL.

32. The payments under the Administrative Services Agreements were not legitimate payments for services rendered, because the agreements were regularly back-dated without regard for the provision of actual services. For example, JAE Y. LEE and other Co-Conspirators back-dated the first NWPL-Sterling agreement in early 2013, the third agreement in August 2014, and the fourth agreement in February 2015. Further, in April 2015, LEE signed a new version of the NWPL-MTL Administrative Services

Agreement and back-dated it to October 1, 2014. The Co-Conspirators' back-dating these contracts resulted from increases in the amount of the kickback payments and also served to hide the true nature of the kickback payments.

33. JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and others, wrongfully agreed to conceal the Administrative Services Agreements with Sterling and with MTL from the NWPL physician-shareholders. In order to assuage physician concerns, LEE, REID, and PULS affirmatively misrepresented, and directed others to misrepresent, the financial relationship between NWPL and the other toxicology laboratories to physicians.

34. The Co-Conspirators tracked the number of urine specimens from NWPL physician shareholders that were transported to NWPL's Bellevue laboratory, and the Co-Conspirators further tracked the number of urine specimens that were transported to Sterling and MTL for toxicology testing as arranged for by the Co-Conspirators. The Co-Conspirators used these numbers, in part, to determine the payments required under the Administrative Services Agreements.

35. Between January 2013 and July 2015, JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and other NWPL employees caused thousands of urine specimens from patients with federal insurance to be sent from NWPL's Bellevue laboratory to Sterling and to MTL. Sterling conducted toxicology testing on these urine specimens and submitted claims for payment to Federal health care programs for this testing for more than $25 million. In total, during this time period, Sterling received more than $7.1 million from Federal health care programs for these submissions. MTL conducted toxicology testing on these urine specimens; and MTL submitted claims for payment for this urine toxicology testing of more than $2 million to Federal health care programs. In total, during this time period, MTL received more than $460,000 from Federal health care programs for these submissions.

36. Between February 2013 and August 2015, NWPL, JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS received kickback payments from Sterling

and MTL. Sterling made payments every month from at least February 2013 to June 2015. In February 2013, the monthly payment was $34,579, eventually, in June 2015, the monthly payment was $261,291.67. In total, NWPL received more than $3.4 million in kickback payments from Sterling. MTL made $50,000 payments to NWPL every month from October 2014 through June 2015. In total, NWPL received $450,000 in kickback payments from MTL.

### D. Overt Acts

37.     During the course of and in furtherance of the conspiracy, JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and others, committed the following overt acts, among others, within the Western District of Washington and elsewhere:

    a.  On or about November 20, 2014, JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS caused check number 64313, in the amount of $222,541.67, payable to NWPL and drawn on Sterling's bank account, to be deposited in NWPL's Wells Fargo account ending in 4952, purportedly for NWPL's services pursuant to the Services Agreements dated January 1, 2014 and August 1, 2014.

    b.  On or about November 20, 2014, JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS arranged for certain urine specimens to be sent to Sterling for toxicology testing and related services for which payment was made in whole and in part under a Federal health care program.

    c.  On or about January 9, 2015, JAE Y. LEE and others caused an interstate wire transfer in the amount of $50,000 to be sent from the Bank of America account of Blackfly Investments DBA MTL, and deposited into NWPL's Wells Fargo bank account, purportedly for NWPL's services pursuant to the Services Agreement dated October 1, 2014.

    d.  On or about February 6, 2015, JAE Y. LEE and others caused an interstate wire transfer in the amount of $50,000 to be sent from the Bank of America account of Blackfly Investments DBA MTL, and deposited into NWPL's Wells Fargo bank account,

purportedly for NWPL's services pursuant to the MTL Services Agreement dated October 1, 2014.

  e. On or about February 10, 2015, JAE Y. LEE and others caused an amendment to the first NWPL-Sterling Services Agreement to be signed and back-dated to January 1, 2015.

  f. On or about March 3, 2015, JAE Y. LEE, RICHARD W. REID, and KEVIN PULS caused check number 3536 to be prepared in the amount of $20,000, payable to NWPL physician-shareholder D.T. and drawn on NWPL's Wells Fargo bank account ending in 5058, as an inducement for D.T. to send urine specimens from federally insured patients to NWPL.

  g. On or about April 30, 2015, JAE Y. LEE, caused another version of the NWPL-MTL Administrative Services Agreement to be signed and back-dated to October 1, 2014.

  h. On or about May 21, 2015, JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS caused check number 66617, in the amount of $261,291.67, payable to NWPL and drawn on Sterling's bank account, to be deposited in NWPL's Wells Fargo account ending in 4952, purportedly for NWPL's services pursuant to the Services Agreements dated January 1, 2015 and August 1, 2014.

  i. On or about June 25, 2015, JAE Y. LEE and others terminated all of the Administrative Services Agreements between NWPL and Sterling, in order to conceal wrongful conduct from government investigators.

  j. On or about July 2, 2015, JAE Y. LEE and others terminated the Administrative Services Agreement between NWPL and MTL, in order to conceal wrongful conduct from government investigators.

  All in violation of Title 18, United States Code, Section 371.

//
//

## COUNTS 2-5
### (Receipt of Kickbacks)

38. The allegations in paragraphs 1-37 are re-alleged and incorporated by reference as if set forth in full herein.

39. In exchange for JAE Y. LEE, RICHARD W. REID, and KEVIN W. PULS ordering, and arranging for the ordering of, urine toxicology testing and related services to be conducted by Sterling and MTL, including but not limited to those services reimbursed by Medicare, TRICARE, and Medicaid, NWPL solicited and received compensation from Sterling and MTL.

40. On or about the dates listed below, at Bellevue, in the Western District of Washington, and elsewhere, JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and NWPL did knowingly and willfully solicit and receive the remuneration listed below, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes from Sterling, MTL, and others, in return for LEE, REID, PULS, NWPL and others ordering, and arranging for the ordering of, urine toxicology testing and related services to be conducted by Sterling and MTL for which payment was made in whole and in part under a Federal health care program, that is, Medicare, TRICARE, and Medicaid:

//
//

| Count | Date Payment Received | Payment Amount | Payment Description |
|---|---|---|---|
| 2 | On or about November 7, 2014 | $50,000.00 | Payment received by NWPL from MTL, purportedly for services pursuant to October 1, 2014 Services Agreement |
| 3 | On or about November 20, 2014 | $222,541.67 | Payment received by NWPL from Sterling, purportedly for services pursuant to January 1, 2014, and August 1, 2014 Services Agreements |
| 4 | On or about February 6, 2015 | $50,000.00 | Payment received by NWPL from MTL, purportedly for services pursuant to October 1, 2014 Services Agreement |
| 5 | On or about May 21, 2015 | $261,291.67 | Payment NWPL from Sterling, purportedly for services pursuant to January 1, 2015, and August 1, 2014 Services Agreements |

All in violation of 42 U.S.C. § 1320a-7b(b)(1)(B) and Title 18, U.S.C. 2.

## ASSET FORFEITURE ALLEGATIONS

The allegations in Count 1 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)C) (by way of Title 28, United States Code, Section 2461(c)). Upon conviction of the offense charged in Count 1, the defendants JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and NWPL shall each forfeit to the United States any property constituting, or derived from, any proceeds they obtained as a result of the offense. This property includes, but is not limited to, sums of money representing the proceeds each defendant obtained as a result of the offense.

The allegations in Counts 2-5 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7). Upon conviction of an offense charged in Counts 2-5, the defendants JAE Y. LEE, RICHARD W. REID, KEVIN W. PULS, and NWPL shall each forfeit to the United States any property constituting, or derived from, any proceeds they obtained as a result of the offense. This property includes, but is not limited to, sums of money representing the proceeds each defendant obtained as a result of the offense.

**Substitute Property.** If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

a. has been transferred or sold to, or deposited with, a third party;

b. has been placed beyond the jurisdiction of the Court;

c. has been diminished in value; or,

d. has been commingled with other property which cannot be divided without difficulty,

//

//

```
 1  it is the intent of the United States to seek the forfeiture of any other property of the
 2  defendants' up to the value of the above-described forfeitable property pursuant to Title
 3  21, United States Code, Section 853(p).
 4                                          A TRUE BILL:
 5                                          DATED:  11/6/19
 6                                          (Signature of Foreperson redacted
 7                                          Pursuant to the policy of the Judicial
                                            Conference of the United States)
 8
                                            _____
 9                                          FOREPERSON
10
11  _____
12  TESSA M. GORMAN
    Attorney for the United States,
13  Acting Under Authority Conferred by 28 U.S.C. § 515
14
15  _____
16  ANDREW C. FRIEDMAN
    Assistant United States Attorney
17
18  _____
19  BRIAN D. WERNER
    Assistant United States Attorney
20
21  _____
    MATTHEW D. DIGGS
22  Assistant United States Attorney
23
24
25
26
27
28
```

INDICTMENT/LEE, ET AL. - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970